1  *Charlene H. Sorrentino*
   CHARLENE H. SORRENTINO
2  UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10  ALFRED RUBEN GONZALES,

11              Petitioner,              No. CIV S-06-196 MCE CHS P

12      vs.

13  DERRAL G. ADAMS, et al.,

14              Respondents.        FINDINGS AND RECOMMENDATIONS

15  _____/

16                      I.  INTRODUCTION

17          Petitioner Alfred Ruben Gonzales is a state prisoner proceeding pro se with a

18  petition for writ of habeas corpus brought pursuant to 28 U.S.C. §2254.  Petitioner stands

19  convicted of spousal assault, kidnaping, violating a restraining order, and possession of a firearm

20  by a felon.  He is currently serving the imposed aggregate sentence of 21 years and eight months

21  in prison.

22          The petition presents two distinct grounds for relief.  Petitioner claims that (A) the

23  prosecution failed to disclose material impeachment information in violation of the Supreme

24  Court's mandate in *Brady v. Maryland*; 373 U.S. 83 (1963); and (B) the trial court improperly

25  admitted evidence of his gang affiliation.  For the reasons that follow, petitioner is not entitled to

26  relief on either claim.

                                1

II.  FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was charged with various offenses relating to an assault on his estranged wife, another alleged assault on his girlfriend, and possession of weapons.  The following supporting facts were set forth in the unpublished opinion of the California Court of Appeal, Third District, case C042241.[1]   Petitioner is the defendant referred to therein.

[Charges Involving Gonzales, Petitioner's Estranged Wife:]

Shortly before midnight on July 4, 2000, Officer Keith Hughes of the Sacramento Police Department was dispatched to a Chevron gas station on Broadway to respond to a report of possible kidnaping and domestic violence.  The Chevron lot was empty, but Hughes saw another unit had responded about a block south of the station.

After Hughes pulled up behind the other squad car and got out of his vehicle, he was approached by Charlene Henderson, who was agitated and upset.  Henderson pointed to defendant, who was detained in the back of the other police car, and told Hughes, "He [defendant] did it.  That's the one.  He did it."

Henderson told Hughes she and Norma Gonzales had been watching fireworks that night, and they stopped at the Chevron station to get gas and because they were having car problems.  While the car was being fixed, defendant pulled up in his car.  He was very angry and yelled at Gonzales to get in his car.  She refused.  Gonzales tried to dial 911 on her cell phone, but defendant took the phone from her.  Gonzales told Henderson to call the police.  Defendant pulled Gonzales by her hair into his car while she screamed for Henderson to call the police.   Defendant told the other people around the car to get away or there would be trouble.  Defendant drove off with Gonzales.

After Henderson explained to Hughes what had happened, she took him to a house where Hughes had been notified Gonzales had gone.  The house belonged to Jane Tam.  Gonzales was shaking and holding a clump of her hair in her hand.  She had been crying and appeared to be terrified.  Gonzales confirmed what Henderson had reported.  She said defendant was her husband.  She said she had a restraining order against him and had told him to leave.

She said after he pulled her into the car he squeezed her arm and neck.  As he was driving, she threw the cell phone out of the window.  He pulled to the side of the road and she took the keys

---

[1] Lodged document 5 (6/06/06).

from the ignition and threw them out the window.  When defendant went to find the keys, she escaped.  She ran to Tam's house and screamed for help.  Tam let her into the house, shut the door, and called the police.

Gonzales told Hughes she was afraid of the defendant because he had been abusive to her in the past, because he was a G-Force gang member and had been known to carry a gun.

Neither Gonzales nor Henderson appeared to be under the influence.

Hughes heard from Gonzales again two or three days later when defendant was released from jail.  Gonzales was upset defendant had been released, and stated she was fearful for her life.

At trial, Gonzales recanted everything she had told Hughes.  She stated she had been drinking the night of July 4th and that her memory of that night was fuzzy.  She denied she had tried to call the police or told Henderson to call the police.  She stated she got into defendant's car willingly.  She said she was fighting with defendant because she was jealous of his girlfriend and was angry that defendant did not want to spend the day with his son.  She became enraged when she saw defendant's girlfriend's picture on the dashboard.  Defendant pulled her hair out when she tried to jump out of the car, but he had only been trying to keep her from hurting herself.  She stated defendant was no longer a gang member.

[Charges Involving Bedford:]

Deputy Kurt Zeiler of the Yolo County Sheriff's Department was at a Chevron gasoline station on County Road 102 on September 9, 2000, when he was approached by Danika Bedford.  Bedford told him she was fleeing from a domestic violence situation that had occurred in Sacramento.  She told him she had been in a fight with her live-in boyfriend, who had pulled her hair and dragged her across the floor, sat on her, and cut her arm with a steak knife.

Bedford was reluctant to give Zeiler any information about her boyfriend because she said he was part of the G-Force gang.  She was afraid he would kill her if she gave his name.

Zeiler took Bedford to a Sacramento police station where she spoke to Officer Christian Prince.  She repeated her story to Officer Prince.  She indicated defendant was a member of the G-Force gang.  She told Prince where there was a weapon in their house, and gave permission for the house to be searched.

At trial Bedford recanted everything she had told Zeiler and Prince.  She claimed she cut herself with the steak knife.  She denied that

1    defendant was a G-Force gang member.

2    [Charges Involving Weapons Possession:]

3    Six officers searched defendant's house in the early morning hours
     of September 20, 2000.  The officers found two revolvers on a
4    shelf where Bedford had indicated there was a gun.  The officers
     also recovered ammunition and boxes of rubberized pistol grips.
5    Defendant was out of jail on bail at the time.

6    Officer Darryl Rosen testified he assisted Prince in taking
     defendant into custody.  He testified he asked defendant if there
7    were any weapons in the house, and defendant replied there were
     none.  When he confronted defendant with this defendant
8    responded "I had to try..."

9    Defendant testified at trial and stated that he had not been affiliated
     with the G-Force gang since he was released from prison in 1998.
10

11   (C042241 opinion at 2-5.)

12          The jury found petitioner guilty of spousal assault, kidnaping, and violating a

13   restraining order with respect to Gonzales (counts one, two and three).  (*Id*. at 3.)  It also found

14   him guilty of being a felon in possession of a firearm and in possession of ammunition (counts

15   seven and eight).  (*Id*.)  The jury found true the allegation that petitioner committed counts seven

16   and eight while out on bail.  (*Id*.)  The jury acquitted petitioner of inflicting corporal injury,

17   assault with a deadly weapon, and criminal threats against Bedford (counts four, five, and six).

18   (*Id*.)  The jury found petitioner guilty of the lesser offense of battery against Bedford.  (*Id*.)

19   Petitioner was sentenced to serve 21 years and eight months in state prison.  (*Id*.)

20              II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

21          An application for writ of habeas corpus by a person in custody under judgment of

22   a state court can be granted only for violations of the Constitution or laws of the United States.

23   28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

24   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

25   This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

26   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

                                              4

1  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

2  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

3  state court proceedings unless the state court's adjudication of the claim:

> 4  (1) resulted in a decision that was contrary to, or involved an
>    unreasonable application of, clearly established Federal law, as
> 5  determined by the Supreme Court of the United States; or
>
> 6  (2) resulted in a decision that was based on an unreasonable
>    determination of the facts in light of the evidence presented in the
> 7  State court proceeding.

8  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

9  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

10  III.  ANALYSIS OF THE CLAIMS

11  A.    *Brady* Disclosure

12  In *Brady v. Maryland*, the United States Supreme Court held that the suppression

13  before trial of requested evidence that is favorable to an accused violates due process where the

14  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

15  the prosecution.  373 U.S. 83 (1963).  Petitioner contends that the prosecution withheld material

16  information that could have been used to impeach Officer Rosen, one of its witnesses.

17  Petitioner's trial commenced in early February, 2002.  According to the defense's

18  motion for a new trial, five women reported between December 14, 2001 and January 2, 2002

19  that Officer Rosen had sexually assaulted or raped them.  (Clerk's Transcript on Appeal ("CT")[2]

20  at 223.)  On December 28, 2001, Rosen was suspended with pay.  (*Id.*)  On January 7, 2002, the

21  Sacramento County District Attorney's Office began an investigation.  (*Id.* at 223-34.)  Rosen

22  was eventually charged with 17 felonies and misdemeanors, including rape, sexual battery,

23  assault by a police officer, and false imprisonment.  (*Id.* at 184.)  The allegations against Rosen

24  were not revealed to the defense prior to or during petitioner's trial.

25

26      [2] Lodged document 8 (6/06/06).

5

1    Rosen testified briefly at petitioner's trial regarding the weapons search of

2    petitioner's home and petitioner's subsequent statements.  (RT at 600-602.)  Following

3    petitioner's conviction and the revelations concerning Rosen, petitioner moved for a new trial

4    based upon a claim of *Brady* error.  The trial court denied the motion, finding that the

5    undisclosed evidence was not material under *Brady*; the court also noted that the prosecution had

6    presented overwhelming evidence on the domestic violence counts, and evidence beyond

7    Rosen's testimony on the guns and ammunition charges.  (RT at 1326-27.)

8    The *Brady* duty to disclose applies to impeachment evidence regarding the

9    prosecution's witnesses.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  In addition, *Brady*

10   suppression occurs when the government fails to turn over evidence that is "known only to police

11   investigators and not to the prosecutor."  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  Such

12   evidence is material "if there is a reasonable probability that, had the evidence been disclosed to

13   the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 676;

14   *Kyles*, 514 U.S. at 433-34.  A reasonable probability of a different result is shown where the

15   evidentiary suppression "undermines confidence in the outcome of the trial."  *Kyles*, 514 U.S. at

16   434 (*quoting Bagley*, 473 U.S. at 678).

17   On direct appeal, the state appellate court denied petitioner's *Brady* claim, finding

18   that:

19       Rosen's testimony was not material to the charges related to the
         abuse of Gonzales.  Rosen's involvement in the trial was minimal.
20       His direct testimony took up less than two and a half pages of the
         trial transcript.  Rosen's testimony was limited to testifying that he
21       discovered weapons in defendant's house and that defendant told
         Rosen he had no weapons...
22
         Additionally, the testimony of Officer Hughes regarding the
23       defendant's assault on Gonzales was corroborated by the testimony
         of Jane Tam as well as four tapes from Gonzales and the witness
24       who called 911 that evening.  It is not reasonably probable the
         result on these charges would have been different had the
25       information about Rosen been disclosed.

26       Neither was Rosen's testimony material to the weapons possession

6

charges because there was no reasonable probability the trial would
have resulted differently had the jury known of the investigation
surrounding Rosen.  Rosen was not the only officer to see the guns
at defendant's house.  Officer Prince also testified he saw the
weapons on a shelf in defendant's house.  In addition to these two
officers, four other officers responded to search defendant's house.
Additionally, both Gonzales and Bedford told officers defendant
had guns.  The investigation surrounding Rosen would not have
reasonably cast any doubt on the weapons possessions charges in
light of the overwhelming evidence that defendant possessed the
weapons.

(C042241 opinion at 11-13.)

In *Horton v. Mayle*, the Ninth Circuit held that the California Supreme Court had

unreasonably applied clearly established federal law when it issued summary dismissal of a

petitioner's *Brady* claim that the prosecutor withheld impeachment evidence about one of its key

witnesses.  408 F.3d 570, 579 (9th Cir. 2005).  In reaching that conclusion, the court noted that

The recurrent theme of [Supreme Court cases finding *Brady*
suppression of impeachment evidence] is that where the
prosecution fails to disclose evidence such as the existence of a
leniency deal or promise that would be valuable in impeaching a
witness *whose testimony is central to the prosecution's case*, it
violates the due process rights of the accused and undermines
confidence in the outcome of the trial.

*Id*. at 581 (emphasis added).  The *Horton* court cited two reasons for finding a due process

violation in that case: (1) the challenged witness' testimony was central to the prosecution's case,

and (2) the suppressed impeachment evidence would have actually demonstrated that the witness

"had an interest in fabricating his testimony."  *Id*. at 579.

In this case, as the state appellate court set forth, the witness in question played a

small and insignificant role at petitioner's trial.  Rosen's testimony was not central to the

prosecution's case for any count of conviction, nor did the suppressed impeachment evidence

show that he had any motivation to fabricate testimony at petitioner's trial.  There is no

reasonable probability that the result of the proceeding would have been different had the

information been disclosed to the defense.  Petitioner is not entitled to relief on his *Brady* claim.

*See United States v. Edwards*, 442 F.3d 258, 268 (5th Cir. 2006) (no *Brady* violation for

7

1   suppressed impeachment evidence where witness in question was not the only witness to testify

2   about the defendants' conduct, nor was he the most important).

3       B.      Evidentiary Ruling

4           Prior to commencement of trial, the prosecutor indicated that if Gonzales and Day

5   recanted their original statements to police, he intended to ask them about petitioner's gang

6   membership and their fear of him due to that affiliation.  (Reporter's Transcript on Appeal

7   ("RT")[3] at 40-43.)  The prosecutor asserted that the evidence was relevant to show their possible

8   motivation to recant the original statements they gave to police.  (*Id*.)  The defense opposed the

9   introduction of any evidence related to gang affiliation.  (*Id*.)  The trial court ruled that it would

10  allow the questions concerning petitioner's gang affiliation if the prosecutor could establish that

11  petitioner was, in fact, a gang member.  (*Id*.)

12          Detective Ron Aurich testified at a hearing outside the presence of the jury that

13  petitioner had previously admitted that he was a member of the G-Force gang.  (RT at 51-53.)

14  Aurich also testified that petitioner was a documented member of a Hispanic prison gang.  (*Id*.)

15  Aurich concluded that petitioner was a validated gang member based on: (1) his prior admissions

16  that he was a gang member; (2) probation departmental records; (3) prison-system records; (4)

17  his gang tattoos; and (5) his associates.  (*Id*. at 56.)  Aurich also testified that the last time he had

18  any real contact with petitioner was in 1994.  (*Id*. at 57.)  He did not know if petitioner had

19  remained active with any gang since his release from prison in 1998.  (*Id*. at 62.)  The trial court

20  ruled that evidence of petitioner's gang affiliation could be used to impeach Gonzales and Day if,

21  during trial, they recanted their earlier statements to police.  (*Id*. at 66.)

22          At trial, Gonzales and Day recanted their claims that petitioner had attacked and

23  abused them.  (RT at 136-50; 445-51.)  The prosecutor then elicited evidence that both had told

24  law enforcement officers they were afraid of petitioner because he was a G-Force gang member.

25

26      [3] Lodged documents 10-15 (6/6/06).

(*Id*. at 319; 633.)  Petitioner denied gang membership.  (RT at 738.)  During closing arguments, the prosecutor contended that Gonzales and Day recanted their original statements to police because they believed that petitioner was a gang member, and, as a result, they feared him.  (RT at 983.)  The prosecutor stated to the jury that the purpose of the gang affiliation evidence was to explain why the victim's testimony contradicted their original statements to police: "Whether it's true that he's a gang member or not, if they have the perception and belief that he's a gang member, can inflict some harm on them, that's what counts."  (*Id*.)

            Petitioner argues that the admission of the victims' statements about his gang affiliation violated his due process rights to a fair trial.  The California Court of Appeal rejected the claim, reasoning:

> Gang evidence is not admissible to show criminal disposition or bad character. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) Because of its inflammatory potential, it is only admissible where it is relevant to a material issue other than character. (*Ibid*.) Where gang evidence is objected to on the basis of Evidence Code section 352 as being more prejudicial than probative, the trial court's decision will not be disturbed unless it exceeds the bounds of reason. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)

> Defendant argues the evidence of his gang membership was more prejudicial than probative because it was cumulative of other evidence used to impeach Gonzales and Bedford. The prosecution had presented a battered women's expert to testify that it is not uncommon for a battered woman to recant prior reports of violence.

> Evidence that the victims were afraid of defendant because of his gang membership was highly probative of their credibility at trial. Although there was other evidence to explain why the women would recant, it was not as compelling as their own statements that defendant was a gang member. Moreover, evidence does not become irrelevant simply because it is cumulative. (*People v. Smithey* (1999) 20 Cal.4th 936, 974.)

> The evidence of defendant's gang membership was not particularly prejudicial given the charges against him. As defense counsel argued in objection to the admission of the evidence, being in a gang, "doesn't necessarily mean you're a spousal abuser." The jury acquitted defendant of the charges involving Bedford, thus the evidence apparently was not unduly prejudicial.

Defendant also argues the gang evidence was "particularly improper" because the testimony presented by Aurich did not conclusively establish defendant was a member of a gang at the time of the offenses. However, it was not necessary for the prosecution to conclusively establish defendant's gang membership. As the prosecutor told the jury, whether or not defendant was a member of a gang at the time of the incidents was not important. The relevant fact was whether the victim witnesses believed defendant to be a gang member. The prosecution was entitled to present the evidence to show the victim witnesses were not credible on the witness stand.

In light of the probative nature of the evidence and the probability that its introduction did not prejudice defendant, the trial court's decision to allow the evidence did not exceed the bounds of reason.

Defendant argues the admission of evidence of his gang affiliation improperly allowed the jury to infer he had a propensity to commit the crimes at issue. This was a possible, but not a permissible, inference the jury could have made from the evidence. The admission of the evidence does not violate federal due process unless there are no permissible inferences the jury may draw from it. (*Jammal v. Van de Kamp* (1991) 926 F.2d 918, 920.) The evidence was introduced for the permissible inference that the witnesses falsely recanted their earlier reports to the police. Moreover, the evidence did not render the trial "so arbitrary and fundamentally unfair that it violated federal due process" as evidenced by the fact that the jury acquitted defendant on a substantial number of the charges. ( *Ibid.*)

( C042241 opinion at 3-4.)

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it rendered the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

As the state appellate court noted, "[t]he admission of 'other acts' evidence will violate due process only when there are *no* permissible inferences the jury may draw from the evidence." *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (emphasis in original) (internal quotations and citations omitted); *Boyde*, 404 F.3d at 1172 (9th Cir. 2005) (same). In

1  this case, the victims' statements to police that petitioner was in a gang were offered for the

2  purpose of establishing state of mind, as opposed to propensity or bad character.  There was a

3  permissible inference to be drawn from the gang affiliation evidence (i.e., that the victims

4  recanted their testimony because they were afraid of petitioner, who they believed to be a gang

5  member, whether or not that was true).  Accordingly, admission of that evidence did not violate

6  petitioner's right to due process.

7                                    IV.  CONCLUSION

8              For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

9  application for writ of habeas corpus be DENIED.

10             These findings and recommendations are submitted to the United States District

11 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12 days after being served with these findings and recommendations, any party may file written

13 objections with the court and serve a copy on all parties.  Such a document should be captioned

14 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15 shall be served and filed within ten days after service of the objections.  The parties are advised

16 that failure to file objections within the specified time may waive the right to appeal the District

17 Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

18 DATED: August 28, 2009.

19                                    CHARLENE H. SORRENTINO
                                     UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26